# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

SALVADOR ZAPIEN,                          1:08-cv-01988-DLB (HC)

               Petitioner,          ORDER DENYING PETITION FOR WRIT OF
                                          HABEAS CORPUS, DIRECTING CLERK OF
                                          COURT TO ENTER JUDGMENT IN FAVOR
   v.                                    OF RESPONDENT, AND DECLINING TO
                                          ISSUE A CERTIFICATE OF APPEALABILITY
D.K. SISTO,
                                          [Doc. 38]
              Respondent.
_____/

     Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Pursuant to 28 U.S.C. § 636(c)(1), the parties have consented to the jurisdiction of the United States Magistrate Judge.  Local Rule 305(b).

<u>BACKGROUND</u>

     Following a jury trial in the Tulare County Superior Court, Petitioner was convicted of second degree murder with a weapon use enhancement.  Petitioner was sentenced to a term of 16 years to life.

     Petitioner filed a notice of appeal.  On December 13, 2007, the California Court of Appeal, Fifth Appellate District affirmed the judgment.

     Petitioner then filed a petition for review to the California Supreme Court, which was denied.  He also filed a petition for writ of certiorari to the United States Supreme Court, which was also denied.

1    Petitioner filed a petition for writ of habeas corpus in the California Superior Court,

2 Tulare County.  The court denied the petition in a reasoned decision.

3    On March 12, 2009, Petitioner filed a petition for writ of habeas corpus in the California

4 Court of Appeal, Fifth Appellate District.  The court denied the petition without prejudice

5 because Petitioner "failed to summarize all the facts pertinent to his challenges and to provide an

6 adequate record."

7    Petitioner thereafter filed a petition for writ of habeas corpus in the California Supreme

8 Court, which was summarily denied with citation to In re Swain, 34 Cal.2d 300, 304 (1949).

9    Petitioner filed the instant petition for writ of habeas corpus on December 31, 2008.

10    On August 20, 2009, the Court granted Petitioner's motion to stay and hold the petition in

11 abeyance while he returned to the state courts to exhaust the unexhausted claims.

12    On July 12, 2011, the Court granted Respondent's motion to dismiss the third amended

13 petition as a mixed petition unless Petitioner elected to delete the unexhausted claims.

14    On July 22, 2011, Petitioner filed a fourth amended petition raising only the exhausted

15 claims.  Respondent filed an answer to the fourth amended petition on October 7, 2011, and

16 Petitioner filed a reply on November 2, 2011.

17                          STATEMENT OF FACTS[1]

18    The fatal stabbing in this case occurred on September 22, 2001.  About
     two months earlier, the victim moved out of the residence she shared with
19   [Petitioner].  The victim apparently did not reveal to [Petitioner] the address or
     phone number of her new residence.  However, [Petitioner] continued to call the
20   victim on the cell phone she used for work.  A few days before the killing, the
     victim asked her work supervisor if her cell phone number could be changed
21   because [Petitioner] was calling her.  Although the victim's request for a new
     number was approved, it was not changed before she was killed.
22
         On the evening of September 22, 2001, the victim attended a wedding
23   reception for one of her male coworkers.  She arrived at the reception hall at
     approximately 5:00 p.m., around the same time as her friend and coworker,
24   Virginia Contreras, and Contreras's date, Juan Moya.  The three sat at a table near
     one of the exists of the reception hall.
25
         About an hour later, [Petitioner] showed up.  The victim, who had not
26   mentioned [Petitioner] was going to be there, looked at Contreras with an

27 ────────────────

28    [1] The following statement of facts is taken from the state appellate court opinion on direct appeal as Lodged
     Document 4, which is presumed correct. 28 U.S.C. §§ 2254 (d)(2), (e)(1).

                                      2

expression of surprise. [Petitioner] came up to their table, presented the victim with a plastic red rose and asked if he could join them.  The victim replied, "'Well, I guess, if you want.'"

[Petitioner] did not appear to be intoxicated when he arrived at the wedding but, in Moya's words, was "talking real well."  During the course of the evening, the victim, Moya, and Contreras each had one or two beers, and [Petitioner] may have had two or three beers. [Petitioner] never appeared intoxicated to Moya or Contreras.  They also observed no arguing between [Petitioner] and the victim, who danced together once or twice.

During the evening, [Petitioner] conversed with Moya. [Petitioner] asked him about the possibility of Moya hiring him as a truck driver.  Moya told [Petitioner] they could talk once [Petitioner] obtained a truck-driving license. [Petitioner] also asked Moya questions about who the victim was seeing.  Moya responded that it was not his (Moya's) business to check up on who the victim was seeing.

Around 9:00 p.m., the victim, Moya, and Contreras decided to leave the wedding reception.  They walked together from the reception hall to their vehicles.  Contreras testified:

"[CONTRERAS]: We were leaving the building.  We went and said good by [sic] to the bride and groom, and he stood up-

"THE COURT: Who is 'he'?

"[CONTRERAS]: Salvador.  He walked with us, as walking Angela out.  And we were maybe a couple steps in front of Angela and Salvador.  I looked back and it was normal.  And Juan and I continued to the car which was just about in front of it.  There is only-[sic] we were parked here-we were parked facing south, and she was parked facing north, and only one car in between us, so you can clearly see her, Angela, and Salvador.

"We got into the car immediately when they were approaching Angela's car.  She unlocked it and opened the door.  And when she was going to get in, we were already-had pulled behind her, so we saw her get in the car, and Salvador closed the door.  And then we moved up so that she can pull behind Juan and I, and she was right behind us.  And then he continued-Salvador continued to walk towards the hall through the main entrance."

Contreras confirmed she did not see any kind of argument between [Petitioner] and the victim.

After they left the parking lot, Moya and Contreras initially observed the victim's car behind them but shortly lost sight of her.  Contreras called the victim's cell phone several times and left messages when the victim failed to answer.  After Moya briefly stopped at a stop sign to wait for the victim's car, Moya and Contreras continued on their journey home.  On cross-examination, Moya confirmed they were not concerned enough to turn around to see where the victim was, explaining, "We didn't think that anything could have happened, that's why . . . ."  Contreras also testified: "I didn't worry because there was no arguments.  There was no other indication of him [Petitioner] being upset.  He wasn't drinking.  He wasn't drunk.  He didn't smoke.  He was actually-he was calm.  So there was no-nothing that indicated to me that [the victim] was in

3

danger...."

Around 9:19 p.m., a sheriff's deputy discovered the victim's car abandoned in a vineyard about a mile or so outside the town where the wedding reception was held. It appeared the car had traveled out of its lane of the two-lane road, crossed the dirt shoulder, and come to rest in a couple rows of grape vines. The interior of the car was covered with blood and a black-handled knife was seen stuck into the panel of the driver's door. About five to ten minutes later, the deputy was notified about someone being brought into the hospital. He testified the hospital was about a 15-minute drive from the crime scene.

Analysis of evidence gathered from the crime scene and damage to the victim's car and [Petitioner]'s pickup truck revealed that the front end of [Petitioner]'s truck had collided with the left side of the victim's car while traveling at a high rate of speed. The evidence also indicated that the driver's window of the victim's car had been shattered while it was in the up position. None of her other windows was broken.

A hospital security guard testified that he observed [Petitioner] driving at high speed up to the emergency driveway entrance to the hospital. About 15 minutes later, the security guard was paged to the waiting room. He noticed a lot of blood on [Petitioner]. The security guard asked [Petitioner] to move his truck and to go to the waiting room to register his wife. [Petitioner] complied with the request. The security guard testified that, when [Petitioner] returned from moving his truck, he was crying and "got on his knees and begged to see his wife." The security guard asked [Petitioner] what had happened. [Petitioner] said, "it was a long story, that they were separated and he-he saw her and got jealous and they both did it." Shortly thereafter, around 9:30 p.m., a sheriff's deputy arrived at the hospital and the security guard left.

A pathologist testified that the victim had 29 stab wounds to her upper body. Five of the wounds were deeply penetrating, causing injury to internal organs, including her heart. The stab wound to the victim's heart completely severed the left ventricle and ended in the heart chamber. The pathologist opined that after this wound was inflicted, the victim would have lost consciousness within a matter of minutes. The victim also had a number of defensive wounds on her hands. The pathologist opined that the cause of death was multiple stab wounds to the chest.

The sheriff's deputy who arrived at the hospital around 9:30 p.m. met [Petitioner] in the lobby and had him go outside and sit on the curb. [Petitioner] told the deputy he used to live in Fresno with his wife. He said they had been at a party and had left to get some beer and to be by themselves. While inside his wife's car, they got into an argument. [Petitioner] said he picked a knife up off the floorboard and stabbed her "a lot."

Another deputy arrived to transport [Petitioner] to the local substation of the sheriff's department. A photograph of [Petitioner]'s right hand, taken after his arrest, showed his fingers and knuckles were swollen. He also had a slight abrasion on his arm. During the ride to the substation, [Petitioner] was crying and kept asking if the victim was okay.

[Petitioner] remained at the substation until around 1:00 a.m., when Frank Arnold, a sheriff's detective, arrived to transport [Petitioner] to the violent crimes unit. Detective Arnold noticed [Petitioner] appeared to have trouble walking and

thus thought he might be intoxicated. The detective gave [Petitioner] a bag and told him not to throw up in his car.

A blood sample was taken from [Petitioner] around 2:00 a.m. No measurable amount of alcohol was found in the sample. A forensic toxicologist testified that, had a person stopped drinking at 9:00 p.m., and had a blood alcohol of .00 percent at 2:00 a.m., the maximum number of drinks that person could have had before 9:00 p.m. would have been four. If the person's blood alcohol level had peaked at 9:00 p.m., the person's maximum blood alcohol level would have been .1 or .12 percent at that time. By 1:00 a.m., the person's blood alcohol level would be around .02 percent. At that level, the toxicologist would not expect the person to exhibit signs of extreme intoxication, such as having difficulty walking.

In an interview starting sometime between 1:30 and 2:00 a.m., [Petitioner] spoke with Detective Arnold and another detective about the stabbing. [Petitioner]'s heat of passion theory at trial, and now on appeal, was based on the statements he made to the detectives during this interview. We therefore set forth [Petitioner]'s statements in some detail below.

[Petitioner] told the detectives that he called the victim on her cell phone around 4:30 p.m., and that she invited him to come to the wedding. [Petitioner] also described consuming a number of alcoholic beverages before and during the wedding reception. According to [Petitioner], around 3:00 p.m., he drank three or four inches from a bottle of rum. Before he reached the wedding reception, he stopped at a convenience store, where he purchased the plastic rose for the victim, plus a small bottle of rum. While he was driving, he consumed the rum and threw the bottle out the window. During the wedding reception, he had four or five beers.

[Petitioner] claimed that when the victim and her companions got up to leave the wedding reception around 9:00 p.m., [Petitioner] asked the victim to remain with him. When she declined, [Petitioner] asked why. The victim responded with a number of insults, including that [Petitioner] was "not a man," a "piece of shit," and a Spanish slur [Petitioner] translated for the detectives as meaning a "bull with no balls." [Petitioner] told the detectives he became upset and said to the victim, "so all this time, I'm being a bull ... fuck you." But when the victim responded by starting her car, [Petitioner] stood in front of her car and said, "[P]lease Angela." The victim replied, "get out of here, go to hell" and then drove away.

[Petitioner] admitted that he followed the victim in his pickup truck and said that, at one point, she stopped her car and said, "stop following me, God damn asshole. I told you don't, I don't want to be with you anymore." When he continued to follow her, the victim tried to speed up. The [Petitioner] sped up, trying to pass her. [Petitioner] claimed he hit the victim with his truck as he was trying to pass her and that she then went "under the vines." [Petitioner] got out of his truck to go talk to the victim and help her out of her car. When he reached her car, the victim said, "stop it, get the fuck out of here you mother fucker." [Petitioner] tried to open the driver's door but the victim locked it.

According to [Petitioner], he and the victim started arguing and hitting each other through the open window of her car. "She yell at me, you son of a bitch. And I say you God damn bitch all these things I was using, using me. All these, all those two years you was using me and yeah and we start, we start, she starts throwing her head and I don't know how, I don't know how the knife come

in." [Petitioner] confirmed he had a folding knife in his pocket, which he took out and opened.

[Petitioner] admitted to detectives, "I was mad about that time already." When asked what he did with the knife, [Petitioner] said, "I stuck it three or four times." When asked where, [Petitioner] replied, "I think by the lips something like that because ... it's because we, she, we struggle with the hand, the hand and my knife." [Petitioner] confirmed the victim was trying to stop him by grabbing his hand and arm.

[Petitioner] said he then opened the door and tried to pull the victim out but something, probably her seatbelt, was holding her. [Petitioner] said the victim threw a punch at his stomach and he went to hit her with his hand, "but I forget I have a knife." [Petitioner] said he "just throw like that one or two or three times" in the victim's body. He thought he hit her in the stomach but was uncertain.

[Petitioner] got the car door open and stood in front of it. He could not remember which hand the knife was in. The victim said to [Petitioner] "you son of a bitch." [Petitioner] replied, "yeah I'm a son of a bitch now, before what and I start hitting more, hitting more, hitting more." [Petitioner] claimed he did not know where the knife was at the time or see that the victim was bleeding. [Petitioner] stated: "That's when I , I get out of the car and put her over me and put her in, take her to the hospital because after that she say see what we doing, I say yes, that's what you wanted."

[Petitioner] described "driving like hell to the hospital" and repeatedly saying "don't die." [Petitioner] claimed that on the way to the hospital, the victim was breathing and her eyes were open. The victim said to [Petitioner], "Oh I love you or I know."

When asked how many times he stabbed the victim, [Petitioner] said, "I don't know. Probably three or four I don't know." [Petitioner] then said he could not remember, though he remembered hitting her a lot. When asked how he was feeling at the time, [Petitioner] said, "I was mad, I don't want to kill her. I don't want to, just only try to because she was making me so mad she know, she try to provoking [sic] me to get mad or something like that and she provoking me, she know how to do it and she know to tell me all those bad things."

Later during the interview, [Petitioner] explained he did not known how many times he stabbed the victim because "I was not in my conscious, I was so pissed off." [Petitioner] also asserted, "I was drunk, she invite me to the wedding and I was drinking and I was drunk." When asked why he followed her instead of just going home, [Petitioner] responded: "Because I was pissed off for [sic] her" and "I want to argue more with her about why she doing something like that. Inviting me to the , to the wedding to start fighting."

(Lod. Doc. 4 at 2-5.)

DISCUSSION

I.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody

pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

6

1    or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

2    529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered

3    violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises

4    out of the Tulare County Superior Court, which is located within the jurisdiction of this Court.

5    28 U.S.C. §§ 2254(a); 2241(d).

6        On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

7    of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

8    enactment.  Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114

9    F.3d 1484, 1499 (9th Cir. 1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting

10   Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), cert. denied, 520 U.S. 1107, 117 S.Ct.

11   1114 (1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059

12   (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant

13   petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

14   II.     Standard of Review

15       The instant petition is reviewed under the provisions of the Antiterrorism and Effective

16   Death Penalty Act which became effective on April 24, 1996.  Lockyer v. Andrade,  538 U.S. 63,

17   70 (2003).  Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is

18   barred unless a petitioner can show that the state court's adjudication of his claim:

19       (1) resulted in a decision that was contrary to, or involved an unreasonable application of,
20       clearly established Federal law, as determined by the Supreme Court of the United States;
         or
21       (2) resulted in a decision that was based on an unreasonable determination of the facts in
         light of the evidence presented in the State court proceeding.

22
23   28 U.S.C. § 2254(d); Harrington v. Richter, __ U.S. __, __, 131 S.Ct 770, 784, 178 L.Ed.2d 624

24   (2011); Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

25       As a threshold matter, this Court must "first decide what constitutes 'clearly established

26   Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71,

27   quoting 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this

28   Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as

of the time of the relevant state-court decision." <u>Williams</u>, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." <u>Id</u>.  In addition, the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA. <u>Moses v. Payne</u>, 555 F.3d 742, 754 (9th Cir.2009), *quoting* <u>Wright v. Van Patten</u>, 552 U.S. 120, 125 (2008); <u>see</u> <u>Panetti v. Quarterman</u>, 551 U.S. 930 (2007); <u>Carey v. Musladin</u>, 549 U.S. 70 (2006).  If no clearly established Federal law exists, the inquiry is at an end and the Court must defer to the state court's decision. <u>Carey</u>, 549 U.S. 70; <u>Wright</u>, 552 U.S. at 126; <u>Moses</u>, 555 F.3d at 760.

If the Court determines there is governing clearly established Federal law, the Court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of," [the] clearly established Federal law." <u>Lockyer</u>, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." <u>Williams</u>, 529 U.S. at 412-13; <u>see also</u> <u>Lockyer</u>, 538 U.S. at 72. "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" <u>Williams</u>, 529 U.S. at 405, *quoting* Webster's Third New International Dictionary 495 (1976). "A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." <u>Id</u>. If the state court decision is "contrary to" clearly established Supreme Court precedent, the state decision is reviewed under the pre-AEDPA de novo standard. <u>Frantz v. Hazey</u>, 533 F.3d 724, 735 (9th Cir.2008) (en banc).

"Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Williams</u>, 529 U.S. at 413.

1   "[A] federal court may not issue the writ simply because the court concludes in its independent

2   judgment that the relevant state court decision applied clearly established federal law erroneously

3   or incorrectly.  Rather, that application must also be unreasonable." Id. at 411; see also Lockyer,

4   538 U.S. at 75-76.  The writ may issue only "where there is no possibility fairminded jurists

5   could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."

6   Harrington, 131 S.Ct. at 784.  In other words, so long as fairminded jurists could disagree on the

7   correctness of the state courts decision, the decision cannot be considered unreasonable.  Id.  If

8   the Court determines that the state court decision is objectively unreasonable, and the error is not

9   structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious

10  effect on the verdict.  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

11      Petitioner has the burden of establishing that the decision of the state court is contrary to

12  or involved an unreasonable application of United States Supreme Court precedent. Baylor v.

13  Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the

14  states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a

15  state court decision is objectively unreasonable. See LaJoie v. Thompson, 217 F.3d 663, 669 (9th

16  Cir.2000); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

17      AEDPA requires considerable deference to the state courts. "[R]eview under § 2254(d)(1)

18  is limited to the record that was before the state court that adjudicated the claim on the merits,"

19  and "evidence introduced in federal court has no bearing on 2254(d)(1) review." Cullen v.

20  Pinholster, __ U.S. __, __, 131 S.Ct. 1388, 1398-99 (2011).  "Factual determinations by state

21  courts are presumed correct absent clear and convincing evidence to the contrary." Miller-El v.

22  Cockrell, 537 U.S. 322, 340 (2003), citing 28 U.S.C. § 2254(e)(1).  However, a state court

23  factual finding is not entitled to deference if the relevant state court record is unavailable for the

24  federal court to review. Townsend v. Sain, 372 U.S. 293, 319 (1963), overruled by, Keeney v.

25  Tamayo-Reyes, 504 U.S. 1 (1992).

26  III.    Trial Court Sua Sponte Duty To Instruct On Involuntary Manslaughter

27      Petitioner contends the trial court had a sua sponte duty to instruct the jury with

28  involuntary manslaughter.  The California Court of Appeal, Fifth Appellate District denied the

9

claim in the last reasoned decision, stating:

II.  Instructions on involuntary manslaughter

[Petitioner]'s other contention on appeal is that there was sufficient evidence to support instructions on the lesser included offense of involuntary manslaughter. [Petitioner] specifically argues that, because he presented substantial evidence he was intoxicated at the time of the stabbing, the jury should have been instructed that, if it determined as a result of his voluntary intoxication he was unable to form the mental state necessary for first degree murder, second degree murder, or voluntary manslaughter, it could still convict him of involuntary manslaughter.  Thus, [Petitioner] argues either the trial court erred by failing to give instructions on involuntary manslaughter sua sponte, or his trial counsel rendered ineffective assistance for failing to request such instructions.

A.  Failure to instruct sua sponte on involuntary manslaughter

Involuntary manslaughter is a lesser included offense of murder. (*People v. Parras* (2005) 128 Cal.App.4th 1603, 1612-1613.)  A trial court must instruct on lesser included offenses, even in the absence of a request, whenever there is substantial evidence raising question as to whether all of the elements of the charged offense are present.  Conversely, even on request, a trial court has no duty to instruct on any lesser offense unless there is substantial evidence to support such instruction.  (*People v. Cunningham* (2001) 25 Cal.4th 926, 1008.) In this context, substantial evidence is evidence sufficient to deserve consideration by the jury; in other words, evidence that a reasonable jury could find persuasive. (*People v. Benavides* (2005) 35 Cal.4th 69, 102.)  The testimony of a single witness, including that of the defendant, can constitute substantial evidence requiring the court to instruct sua sponte.  (*People v. Lewis* (2001) 25 Cal.4th 610, 646.)

In noncapital cases, error in failing to instruct sua sponte, or to instruct fully, on all lesser included offenses and theories which are supported by the evidence are reviewed for prejudice exclusively under the Watson test.  Thus, a conviction of the charged offense may be reversed in consequence of this form of error only if, after an examination of the entire cause, including the evidence, it appears reasonably probable the defendant would have obtained a more favorable outcome had the error not occurred.  (*People v. Breverman* (1998) 19 Cal.4th 142, 178.)

Assuming, without deciding, there was substantial evidence to support instructions on involuntary manslaughter, any error was harmless.  Evidence that [Petitioner] was unable to form the malice required for second degree murder as a result of voluntary intoxication was weak, at best.  Despite his account to detectives of drinking a considerable quantity of alcohol up to and during the time of the wedding reception, [Petitioner]'s suggestion that he was in a drunken rage when he killed the victim conflicted with the toxicological evidence that before 9:00 p.m., he could have consumed, at most, four alcoholic beverages, and that his blood alcohol level at that time, would have been around .1 or .12 percent.  The toxicologist testified on cross-examination that at this level of intoxication a person might not be thinking clearly.  He also testified that, even if the person was not showing outward signs of intoxication, it would not be safe for the person to drive or fly a plane.  This is a far cry, however, from [Petitioner]'s suggestion that his intoxication essentially rendered him unaware, or unconscious, of his actions during the stabbing.

1

2          Moreover, [Petitioner]'s supposed lapses of awareness occurred at
   incredibly convenient times.  Although he claimed to detectives to remember little
3  about the actual stabbing, as noted above, he did remember his alleged argument
   with the victim in great detail; in particular, he managed to remember all her
4  humiliating remarks, which served as the basis for voluntary manslaughter
   instructions.  In addition, [Petitioner] told detectives that he was unaware of how
5  seriously injured the victim was or that her blood covered his clothes and the
   interior of his truck.  Nonetheless, he had the wherewithal to drive the victim to
6  the emergency room and recounted, again in detail, how he begged her not to die
   and how she said "I know" or "I love you" to him.  Finally, witnesses who
7  observed [Petitioner] near the time of the stabbing testified he did not appear
   intoxicated but was speaking well.

8          On this record, if the jury had been instructed on the offense of involuntary
   manslaughter on a theory of voluntary intoxication, it is highly unlikely that the
9  jury would have found [Petitioner] guilty of this crime rather than of murder.
   Accordingly, we find the failure to give such instructions, if error at all, was
10 harmless.

11 (Lod. Doc. 4 at 13-15.)

12      A challenge to a jury instruction solely as an error under state law does not state a claim

13 cognizable in a federal habeas corpus action.  See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).

14 To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the

15 ailing instruction by itself so infected the entire trial that the resulting conviction violates due

16 process.  See id. at 72.  Additionally, the instruction may not be judged in artificial isolation, but

17 must be considered in the context of the instructions as a whole and the trial record.  Id.  The

18 court must evaluate jury instructions in the context of the overall charge to the jury as a

19 component of the entire trial process.  See United States v. Frady, 456 U.S. 152, 169 (1982)

20 (citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977)).  Furthermore, even if it is determined

21 that the instruction violated the petitioner's right to due process, a petitioner can only obtain

22 relief if the unconstitutional instruction had a substantial influence on the conviction and thereby

23 resulted in actual prejudice under Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710

24 (1993) (whether the error had a substantial and injurious effect or influence in determining the

25 jury's verdict.).  See Hanna v. Riveland, 87 F.3d 1034, 1039 (9th Cir. 1996).  The burden of

26 demonstrating that an erroneous instruction was so prejudicial that it will support a collateral

27 attack on the constitutional validity of a state court's judgment is even greater than the showing

28 required to establish plain error on direct appeal."  Id.

In a capital case, the failure to instruct the jury on a lesser-include offense violates the Due Process Clause if there was evidence to support the instruction. Beck v. Alabama, 447 U.S. 625 (1980). However, the Supreme Court has not determined whether the Due Process Clause requires giving a lesser-included offense instruction in a noncapital case. Id. at 684 n.14; see also Powell v. Hatcher, 407 Fed. App'x 226, 227 (9th Cir. 2011), cert. denied, __ U.S. __, 131 S.Ct. 2647, 179 L.Ed.2d 1228, 2011 WL 1343886 (U.S. May 16, 2011) (denying habeas relief, noting that in Beck the Supreme Court expressly declined to rule on the issue); United States v. Torres-Flores, 502 F.3d 885, 888 n .3 (9th Cir. 2007). Therefore, because there is no clearly established federal law that requires a trial court to instruct on a lesser included offense, there can be no relief under AEDPA. Moses v. Payne, 555 F.3d at 754, *quoting* Wright v. Van Patten, 552 U.S. at 125; see also Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v. Musladin, 549 U.S. 70 (2006); Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir. 1998) (failure of state trial court to instruct on lesser included offenses in non-capital case does not present federal constitutional question).

There may be a violation of due process by failing to instruct on a certain theory if there is substantial evidence presented to support such theory of defense. Bradley v. Duncan, 315 F.3d 1091, 1098-1101 (9th Cir. 2002). Nevertheless, there is no entitlement for the court to give certain instructions if the other instructions given sufficiently present the defense theory. See United States v. Del Muro, 87 F.3d 1078, 1081 (9th Cir. 1996). Here, the Court finds Petitioner's right to due process was not violated by the trial court's failure to instruct the jury on involuntary manslaughter because there was no substantial evidence to support such theory.[2] Indeed, Petitioner's defense at trial was voluntary manslaughter, and an instruction on involuntary manslaughter would have been inconsistent with his theory of the defense. The evidence reflected that the killing was deliberate as he was able to recount his argument with the victim in great detail, including the humiliating remarks he made, he was able to drive the victim

---

[2] Involuntary manslaughter is the unlawful killing of a human being without malice, "in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." Cal. Penal Code § 192(b).

to the hospital and recounted how he begged her not to die, and witnesses who observed

Petitioner near the time of the stabbing reported that he did not appear intoxicated.  Based on

these facts, there was no evidentiary basis for an involuntary manslaughter instruction.

Petitioner's claim that the jury was required to find intent to kill, is incorrect.  First, one

theory of second degree murder of which the jury was instructed did not require a finding of

intent to kill.  (See CT 1012-1013, 1018; CALJIC Nos. 8.10, 8.11, 8.31).  Second, the jury could

find Petitioner had no intent to kill and convict of either second degree murder or voluntary

manslaughter.  (CT 1020.)[3]  Finally, the jury was instructed on how to apply the evidence of

voluntary intoxication pursuant to CALJIC Nos. 4.21 and 4.22.  (CT 1010-1011.)[4]

---

[3] Pursuant to CALJIC No. 8.40, the jury was instructed as follows:
        Every person who unlawfully kills another human being without malice aforethought but either with an intent to kill, or *with conscious disregard for human life*, is guilty of voluntary manslaughter in violation of Penal Code section 192, subdivision (a).
        There is no malice aforethought if the killing occurred upon a sudden quarrel or heat of passion.
        The phrase, "conscious disregard for life," as used in this instruction, means that a killing results from the doing of an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his or her conduct endangers the life of another and who acts with conscious disregard for life.
In order to prove this crime, each of the following elements must be proved:
        1. A human being was killed;
        2. The killing was unlawful; and
        3. The perpetrator of the killing either intended to kill the alleged victim, or *acted in conscious disregard for life*; and
        4. The perpetrator's conduct resulted in the unlawful killing.

(CT 1020, emphasis added.)

[4] CALJIC NO. 4.21 stated:
        In the crimes of 1st Degree Murder and the special circumstances of "Lying in Wait" of which the defendant is accused in Count 1, or that of 2nd Degree Murder Voluntary Manslaughter, which are lesser crimes thereto, a necessary element is the existence in the mind of the defendant of the specific intent to kill and mental states of Willful deliberate and premeditated killing with malice aforethought for Count 1 namely 1st Degree Murder and the special circumstances of "Lying in Wait". 2nd Degree Murder requires a specific intent to kill or knowledge of the danger to and with conscious disregard for human life.  For Voluntary Manslaughter there must exist a specific intent to kill or sudden quarrel of heat of passion and provocation.

        If the evidence shows that the defendant was intoxicated at the time of the alleged crimes, you should consider that fact in deciding whether defendant had the required specific intent or mental state.

        If from all the evidence you have a reasonable doubt whether the defendant formed that specific intent or mental states, you must find that he did not have such specific intent or mental

1    Even assuming the trial court erred by failing to instruct on involuntary manslaughter, any

2    such error was harmless.  In order to grant habeas corpus relief where the state court has

3    determined that a constitutional error was harmless,[5] a reviewing court must determine that (1)

4    the state court's decision was "contrary to" or an "unreasonable application" of Supreme Court

5    harmless error precedent; and (2) the petitioner suffered prejudice under <u>Brecht</u> from the

6    constitutional error.  <u>Inthavong v. LaMarque</u>, 420 F.3d 1055, 1059 (9th Cir. 2005).

7    Here, the California Court of Appeal reasonably concluded that the "evidence that

8    [Petitioner] was unable to form the malice required for second degree murder as a result of

9    voluntary intoxication was weak, at best." (Lod. Doc. 4 at 14.)  More specifically, Petitioner's

10   claim that he was in a drunken rage at the time of killing the victim conflicted with the

11   toxicological evidence that before 9:00 p.m., he could have consumed, at most, four alcoholic

12   beverages, and his blood level would have been .1 or .12 percent.  Although the toxicologist

13   acknowledged that a person with this level may not be thinking clearly or display outwardly signs

14   of intoxication, this is not sufficient evidence to make the determination that Petitioner was

15   unaware, or unconscious of his actions at the time of the stabbing.[6]  For these reasons, Petitioner

16   has not shown that the error had a "substantial and injurious effect" on the verdict.  <u>Brecht</u>, 507

17   U.S. at 637-638.

18   IV.    <u>Ineffective Assistance Of Counsel For Failure To Request Jury Instruction On</u>
            <u>Involuntary Manslaughter</u>

19

20          Petitioner contends defense counsel was ineffective for failing to request jury instructions

21   on involuntary manslaughter.  The California Court of Appeal, Fifth Appellate District denied the

22   _____

23          states.

24   (CT 1010.)

25          [5] In this instance, the state court did not actually find error, rather, it went directly to the issue of prejudice
     without deciding if error occurred.  (Lod. Doc. 4 at 14-15.)

26          [6] To warrant an involuntary manslaughter instruction, the evidence must demonstrate the defendant was
27   acting unconsciously when he committed the act.  <u>See</u> <u>People v. Ochoa</u>, 19 Cal.4th 353, 423-424 (1998) (holding no
     entitlement to instruction on involuntary manslaughter based on voluntary intoxication where the defendant
28   approached the victim, told her to be quiet, displayed a knife, took the victim to a secluded area and told her to
     remove her pants, and when she later asked to put her pants back on he gave permission.)

14

claim in the last reasoned decision, stating:

> B. Failure to request instructions on involuntary manslaughter

> In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was deficient because his or her representation fell below an objective standard of reasonableness under prevailing professional norms.  Second, the defendant must also show prejudice flowing from counsel's performance or lack thereof.  Prejudice is shown only when there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  (*In re Thomas* (2006) 37 Cal.4th 1249, 1256.)

> Once again, evidence defendant's mental state was affected by intoxication was extremely weak.  For the reasons discussed above, we see no reasonable probability the jury, even if fully instructed, would have found that [Petitioner] was so intoxicated that he could not form the mental state required for murder and instead convict him of involuntary manslaughter.  Defense counsel's failure to request instructions on involuntary manslaughter in no way undermines our confidence in the verdict.  Accordingly, the asserted ineffective assistance of counsel was not prejudicial.

(Lod. Doc. 4 at 15-16.)

As previously stated, because there was not substantial evidence to support a jury instruction on involuntary manslaughter, trial counsel was not deficient in refraining from making a futile request for such an instruction.  Rupe v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996) ("[T]he failure to take a futile action can never be deficient performance, . . . ."); Juan H. v. Allen, 408 F.3d 1262, 1273 (9th Cir. 2005) ("[T]rial counsel cannot have been ineffective for failing to raise a meritless objection.")  Consequently, Petitioner cannot demonstrate prejudice from counsel's failure to make a meritless request.  In any event, even if the Court found that a reasonable attorney would have requested an instruction on involuntary manslaughter despite the lack of evidence to support such a claim, there was no prejudice because the trial court would have refused counsel's request pursuant to California law.  Thus, there is not a reasonable probability that Petitioner would have fared better had his counsel requested an instruction on involuntary manslaughter.  In light of the foregoing, the state court's rejection of his claim was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.  28 U.S.C. § 2254(d).

ORDER

Based on the foregoing, it is HEREBY ORDERED that:

1.      The instant petition for writ of habeas corpus is DENIED;

2.      The Clerk of Court is directed to enter judgment in favor of Respondent; and

3.      The Court declines to issue a certificate of appealability.  28 U.S.C. § 2253(c);

        Slack v. McDaniel, 529 U.S. 473, 484 (2000) (a COA should be granted where

        the applicant has made "a substantial showing of the denial of a constitutional

        right," i.e., when "reasonable jurists would find the district court's assessment of

        the constitutional claims debatable or wrong"; Hoffman v. Arave, 455 F.3d 926,

        943 (9th Cir. 2006) (same).  In the present case, the Court finds that reasonable

        jurists would not find it debatable that the state courts' decision denying

        Petitioner's petition for writ of habeas corpus were not "objectively

        unreasonable."

IT IS SO ORDERED.

**Dated:   November 10, 2011**                    _____ **/s/ Dennis L. Beck**_____
                                                 UNITED STATES MAGISTRATE JUDGE